IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 21, 2019 Session

## KRISTIN EDGE HUNT-CARDEN v. JASON VINCENT CARDEN

**Appeal from the Circuit Court for Hamilton County**
**No. 15D1915        Ward Jeffrey Hollingsworth, Judge**

—————————————————————

**No. E2018-00175-COA-R3-CV**

—————————————————————

This appeal involves a marriage of short duration. Following a bench trial, the court granted the wife a divorce and classified and divided the parties' marital estate. The husband takes issue with the trial court's classification and division of the marital property, as well as the award of alimony to the wife. The wife seeks attorney fees and costs. We affirm in part as modified and reverse in part.

**Tenn. R. App. P. Appeal as of Right; Judgment of the Circuit Court**
**Affirmed in Part as Modified and Reversed in Part; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

Alan R. Beard, Chattanooga, Tennessee, for the appellant, Jason Vincent Carden.

Catherine M. White, Chattanooga, Tennessee, for the appellee, Kristin Edge Hunt-Carden.

## OPINION

### I. BACKGROUND

The parties, Kristin Edge Hunt-Carden ("Wife") and Jason Vincent Carden ("Husband"), met in December 2011 and became engaged in January 2013. It appears that the wedding occurred on October 11, 2013.

Prior to the marriage, Wife and Husband were already living together in a pre-marital residence owned by Husband located at 2821 Deerfield Drive, Ooltewah,

Tennessee ("Deerfield"), which Wife was leasing from Husband. Wife paid the bills for the utilities and had an alarm system installed.[1]

Two months prior to the marriage, on August 5, 2013, the couple located the property at 9231 Royal Mountain Drive, Chattanooga, Tennessee ("Royal Mountain"). Husband purchased the residence and put the property in his name as well as the debt. Husband paid down $146,586.58 from funds he had previously obtained in an insurance settlement. The house was purchased for $445,000 and valued at time of trial at $475,000. Wife noted that Husband did not ask her to sign a post-nuptial agreement and did not express to her that Royal Mountain was going to be owned solely by him. Husband admitted that he never asked Wife to sign a pre- or post-nuptial agreement.

Sandy Battles, a realtor, testified that Husband introduced Wife to her as his fiancé and stated that "they" were looking "for a house that would fit their family." Ms. Battles related that she showed Wife and Husband together three or four houses until the Royal Mountain residence was chosen. She recalled that Husband was alone at the closing, that he put down a sizeable down payment, and that the house was titled in his name.

Julie Sexton, Husband's former wife, stated at trial that Husband confirmed to her that he and Wife "were getting married[,] they were going to buy a house and that there would be a bedroom for all the kids." As to the marriage to Wife, Ms. Sexton noted that Husband told her that he and Wife were building a family together and "that [t]here was a lot of work done on all the kids' rooms to make them feel like a home for all three boys." Wife's child from another marriage was to reside with her and Husband in the marital residence.[2]

Wife testified that the couple purchased the new house "in anticipation of marriage." According to Wife, she decorated, repainted, cleaned the carpet, customized her son's closet and desk, and got the house ready as a home for the family. She claimed that certain furnishings in the home were brought from her prior house in Alabama. Upon moving into the new residence, the alarm system which belonged to Wife at Deerfield was installed and the service transferred to Royal Mountain. Wife claimed that at the new house, she did the majority of the lawn upkeep, cleaning, and laundry. In general, she kept the home maintained in good and orderly condition. She also did most of the cooking. Wife related: "I was expected to make it look perfect in the inside and have, you know, meals ready . . . . [It was] a lot of pressure and control. I wasn't allowed to work [outside the home]. . . . I really wasn't allowed to even leave the home much." Wife claimed that Husband "was very controlling." According to Wife, Husband rationed food intake and shower time for her and her son. She asserted that her

---

[1]The equipment/service was later moved to the marital home.
[2]Wife related that her son has Autism Spectrum Disorder, Asperger's, and developmental delays.

parents opened a Sam's Club Warehouse account for her to buy extra groceries because she and her son "were not allowed to ea[t] as much food as Jason and his children."

Wife contended that Husband began abusing her physically in March 2014, when he struck her so hard that it knocked her over backwards and her head hit the bed post. Wife stated that when Husband punched her on the side of the head, "she saw white, a flash of white." She claimed that she "had never been hit ever, and so hard" and "that the pain was excruciating."

At trial, Wife introduced a stream of text messages from Husband in which it appeared that he was apologizing:

> A: Thank God, no bleeding, no fracture. I just don't know what to say. I had no idea it was that bad. I am so incredibly ashamed of myself, Kristin. I will never forgive myself. I'm so, so sorry.
>
> * * *
>
> A: I'm so sorry, sweetie. Please believe that I am here for you and will never, ever let you down. Please trust me. Please trust me. Please put ice on your head and eye. . . . I know you wish you'd never met me. I feel like a meaningless nobody. I hate myself so much.
>
> * * *
>
> A. . . . It's not your fault, at all, sweetie. I need to work on me. I'm not a monster, Kristin. . . .
>
> * * *
>
> A. . . . I'm so sorry for everything. I really am. I can't tell you how ashamed I am. I will never, ever forgive myself. I know you don't believe me, but I am not a bad person. . . .
>
> * * *
>
> A. It will go – it will go away. Sometimes it just takes awhile. I'm very, very sorry, sweetie. I am so, so sorry. You really should put ice on your head and we should have done that last night.

Husband contended that he was apologizing because Wife had suffered a seizure, that he had failed to keep watch over her, and that he had not been there to help her when she needed him. He asserted that his apologies were in response to Wife accusing him of neglecting her. Husband claimed that he did not hit Wife and that any injuries about which she complained occurred during seizure episodes. Wife responded that she does not have the type of seizures (grand mal) that would cause her to fall; rather, her seizures just interrupted her ability to sleep and had not occurred in a very long time. According to Wife, the couple continued to have "[a] lot" of arguments and the relationship "was very, very, very abusive."

Although Wife claimed that she was too afraid to seek medical attention because of retaliation, she contended that her treatment records reveal a concussion on March 10, 2014; another concussion on May 2, 2014; a cut on her leg on August 27, 2014; and an eye injury dated June 11, 2015. She reported injuries to her neck and back on September 8, 2015; dysphagia on March 2, 2016; and hearing issues and vertigo on March 9, 2016, and April 6, 2016. Wife asserted that twice she had been awakened by Husband having nonconsensual sex with her - suffering injuries to her rectum requiring medical treatment after the second act.

Wife claimed that she developed a significant disruption in her speech. Gayle Tucker, a speech therapist, diagnosed aphasia, dysphonia, and dysfluency.[3] She opined that there was no "reason to believe that Wife was malingering." Dr. Adele B. Ackell, a neurologist, concluded that because tests did not reveal an organic reason, Wife's speech symptoms were stress-related. Stephen Muller, Wife's therapist, opined that Wife was suffering from post-traumatic stress disorder due to being abused by Husband. Wife testified that she was unable to work currently because she has difficulty communicating her thoughts and problems focusing and concentrating. The field she formerly worked in requires that an individual have good communication skills.

On September 30, 2015, Wife filed a petition for order of protection, alleging that Husband has a history of domestic abuse and violence and that he had threatened her life. After an ex parte order of protection was granted, Wife also filed a complaint for divorce and obtained a temporary restraining order against Husband. She alleged in her complaint for divorce that "[Husband] creates a hostile living environment at the marital residence, he has threatened and exhibited violence against [Wife] and his own minor children, and is guilty of extreme verbal and emotional abuse to [Wife]."[4] She sought a

---

[3]Ms. Tucker observed that "when we say just aphasia we're talking about someone who had functional speech and language and something happens and they have a disruption. . . ." She testified that dysphonia is a voice disorder and dysfluency is a disruption in the flow of speech.

[4]Counsel for Wife filed a motion to amend the complaint that alleged, "Wife has been the subject of numerous vicious physical assaults and verbal abuse by the Husband resulting in serious physical and emotional injury, for which she seeks damages of no less than

divorce from Husband based on inappropriate marital conduct. In the temporary restraining order, Wife obtained exclusive temporary possession of the marital residence. The parties had been married less than two years. No children were born to the marriage.

Husband argued that Wife was faking severe abuse in an attempt to retain his house and to set herself up for huge payments from him. He noted that not a single neighbor, friend, family member, co-worker, or any other witness appeared at trial to corroborate that any injuries ever occurred to Wife. He asserted that no police reports or any medical records were provided to substantiate that such severe injuries were endured by Wife. Husband testified on direct that no one in his family was violent. However, on cross, he admitted that his brother had been charged with domestic assault on his girlfriend. Wife claimed that Husband's brother had a terrible temper and that the family had sought to have him committed. She noted also that Husband had told her that his mother "had a very short fuse" and was "very verbally abusive" to him and his brother. Husband's ex-wife, Ms. Sexton, corroborated certain claims by Wife.

At the time of trial, Husband's year-to-date earnings averaged out to $8,340.74 gross per month. Husband had accumulated in his 401K a sum of $100,597.00 in marital assets. He claimed that on the day she filed for divorce, Wife removed $21,000 from a SunTrust money market account holding his pre-marital funds that had not been comingled or transmutated. Wife, however, testified that she had contributed money to the account during the time the couple resided at Royal Mountain, depositing her child support and money from her parents into the joint SunTrust account, out of which payments for the mortgage and alarm system were made. Wife indicated that Husband never claimed any of the money was separate. A review of the joint SunTrust statements from June 2014-September 2015 revealed that the money market account and savings account were each titled in both parties' names as well as the checking. Further, money was transferred between the accounts.

The trial court noted in its January 2, 2018, order that "neither party distinguished themselves in the field of veracity," but that "Husband is the les[s] credible of the two." The court found Husband guilty of inappropriate marital conduct based on evidence other than the photos (i.e., text messages) and granted Wife a divorce on those grounds. As to the house, the court recognized "an intention by Husband to treat what may have been separate property as marital. It was a gift to the marital estate . . . . Husband's actions before and at the time of the purchase indicated that, at that time, he intended the house as a gift to the estate. He cannot rescind that gift later, when the relationship begins to sour." The court ordered that upon the sale of the house, Wife was to receive $100,000 of the proceeds. The court further found the marital portion of Husband's retirement to be $100,597, and ordered it equally divided.

---

$5,000,000.00 in actual and putative damages by jury trial."

In an order regarding discretionary costs, the court ruled:

> The [Husband] was not the prevailing party. The [Wife] was awarded the divorce based on [Husband's] inappropriate marital conduct. She was awarded alimony. Court costs were assessed against the [Husband]. The expert witnesses were hired in regard to the [Husband's] allegation that certain photographs produced by the [Wife] were altered or staged. He did not prevail on that issue.
>
> In regard to attorney's fees, the Court is well aware of the frustration in getting this case to a final hearing. However, the [Husband] has not produced any proof that those delays were primarily as a result of the [Wife's] actions. That request is DENIED.

## II. ISSUES

The issues raised in this appeal are restated as follows:

a. Does the evidence support the trial court's finding that Husband made a gift of his pre-marital real estate to the marriage?

b. Does the evidence support the trial court's award of the equity in the marital residence to Wife, in that the court found it had been gifted to the marriage by Husband and given the statutory factors?

c. Did the evidence support the trial court's finding that Husband hit Wife, that she was the more credible witness, and that she was the prevailing party?

d. Whether the trial court correctly relied upon other evidence of abuse by Husband rather than the photographs.

e. Does the evidence preponderate in favor of the trial court's award of alimony to Wife given the statutory factors?

f. Does the evidence preponderate in favor of the trial court's failure to award Wife her attorney's fees given the statutory factors?

g. Is Wife entitled to attorney's fees and costs incurred on appeal?

# III. STANDARD OF REVIEW

This case was tried by the court without a jury. The review of the trial court's findings of fact is de novo with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). Our review of a trial court's conclusions of law is de novo upon the record with no presumption of correctness. *Tyron v. Saturn Corp.*, 254 S.W.3d 321, 327 (Tenn. 2008).

The trial court has broad discretion in fashioning an equitable distribution of marital property, and an appellate court will defer to a trial court's distribution unless it is inconsistent with the statutory factors or is not supported by a preponderance of the evidence. *Baggett v. Baggett*, 422 S.W.3d 537, 543 (Tenn. Ct. App. 2013).

Trial courts have broad discretion to determine spousal support if needed and, if so, the nature, amount, and duration of the award. *Gonsewski v. Gonsewski*, 350 S.W.3d 99 (Tenn. 2011); *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001); *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000). The role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable. *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second guess a trial court's decision absent an abuse of discretion. *Robertson v. Robertson*, 76 S.W.3d 337, 343 (Tenn. 2002). An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on a reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives, and thus envisions a less rigorous review of the lower court's decision and the decreased likelihood that the decision will be reversed on appeal. *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical Inc. v. Beecher*, 312 S.W.3d 515,524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. *Wright*, 337 S.W.3d at 176; *Henderson*, 318 S.W.3d at 335.

For an award (or denial) of attorney's fees, the standard of review is whether an abuse of discretion occurred at the trial level by the trial court. The decision to award attorney's fees as alimony in solido is within the sound discretion of the trial court. *Crabtree*, 16 S.W.3d at 361 and *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct.

App. 1995). The appellate court will not interfere with an award, except upon a showing of an abuse of discretion, where the evidence preponderates against the award. *Long v. Long*, 957 S.W.2d 825 (Tenn. Ct. App. 1997); *Elliot v. Elliot*, 825 S.W.2d 87, 92 (Tenn. Ct. App. 1991); *Butler v. Butler*, 680 S.W.2d 467, 470 (Tenn. Ct. App. 1984). As for the standard required for an award of attorney's fees incurred on appeal, this determination is within the sole discretion of the appellate court. *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995).

## IV. DISCUSSION

### a.

Husband argues that the residence is owned solely by him and is a pre-marital asset. He notes that Wife's name is neither on the deed nor on the note. He asserts that he has paid for all the upkeep and maintenance on the home and that, including food, Wife has only contributed approximately $300 per month to any household expenses. According to Husband, Wife frequently asked him to put her name on the title, but that he "just didn't feel comfortable putting her on the deed to my house." He contends that there was no understanding by the parties that the real estate was transmuted to Wife in any way. Husband argues that no proof has been provided of Wife's contributions to the joint account or payments she made toward the mortgage. He notes that he paid every single mortgage, insurance, property tax, and utility payment pursuant to the order of protection.

Dividing a marital estate necessarily begins with the systematic identification of all of the parties' property interests, classifying each of these interests as either separate or marital property. *Flannary v. Flannary*, 121 S.W.3d 647, 650 (Tenn. 2003); *Conley v. Conley*, 181 S.W.3d 692, 700 (Tenn. Ct. App. 2005); *Anderton v. Anderton*, 988 S.W.2d 675, 679 (Tenn. Ct. App. 1998). Tennessee is a "dual property" state. *Smith v. Smith*, 93 S.W.3d 871, 875-76 (Tenn. Ct. App. 2002). Accordingly, property cannot be included in the marital estate unless it fits within the statutory definition of "marital property." Tenn. Code Ann. § 36-4-121. By the same token, "separate property" should not be included in the marital estate. *Id.*

As general rule, assets acquired by either spouse during the marriage are presumed to be marital property. *Church v. Church*, No. M2004-02702-COA-R3-CV, 2006 WL 2168271, at *7 (Tenn. Ct. App. Aug. 1, 2006); *Hunter v. Hunter*, No. M2002-02560-COA-R3-CV, 2005 WL 1469465, at *4 (Tenn. Ct. App. June 21, 2005). Similarly, assets acquired by either spouse prior to the marriage are presumed to be separate property. Tenn. Code Ann. § 36-4-121. "Separate property" means "[a]ll real and personal property owned by a spouse before marriage." *Id.* "Assets acquired by either spouse prior to the marriage are presumed to be separate property." *Id.*; *McFarland v.*

- 8 -

*McFarland*, No. M2005-01260-COA-R3-CV, 2007 WL 2254576, at * 5 (Tenn. Ct. App. Aug. 6, 2007).

The doctrines of transmutation and commingling provide an avenue whereby separate property can become marital property. *See Eldridge v. Eldridge*, 137 S.W.3d 1, 13-14 (Tenn. Ct. App. 2002):

> [S]eparate property becomes marital property [by commingling] if inextricably mingled with marital property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not occur. . . . [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it becomes marital property. . . . The rationale underlying these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based upon the provision in many marital property statutes that property acquired during the marriage is presumed to be marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

*Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002) (citing HOMER H. CLARK, The Law of Domestic Relations In The United States § 16.2 at 185 (2d ed. 1987)). "Marital property" must be divided equitably between the parties; "separate property" is not subject to division. Tenn. Code Ann. § 36-4-121(a)(1).

The classification of property as either separate or marital is a question of fact for the trial court. *Bower v. Bower*, No. E2011-00978-COA-3-CV, 2012 WL 1752401, at *7 (*citing Mitts v. Mitts*, 39 SW.3d 142, 144-45 (Tenn. Ct. App. 2000)). Trial courts are vested with a large measure of discretion when classifying and dividing the marital estate, thus their decisions are entitled to great weight on appeal. *Sullivan v. Sullivan*, 107 S.W.3d 507, 512 (Tenn. Ct. App. 2002). Unless the court's decision is contrary to the preponderance of the evidence or based on an error of law, it will not be second-guessed on appeal. *Id.*

In this case, the parties shopped as an engaged couple for the house they would move into as husband and wife. It was purchased just two months prior to their wedding in anticipation of their marriage. The real estate located at Royal Mountain was used as the marital residence. It was maintained and managed primarily by Wife. Wife and Husband comingled their money in a joint bank account out of which the mortgage payment was made. Wife noted that the money she placed in the account came from

child support and any cash her parents gave her. Wife's premarital alarm system was transferred to the marital residence, payments for which came out of the joint account.

The court found the testimony of the realtor, Ms. Battles, to be persuasive. She stated that Husband introduced Wife as his fiancé and that "they" were looking for a house to move into as a family. Ms. Sexton, Husband's former wife, related that he confirmed to her "that as they were getting married, they were going to buy a house and that there would be a bedroom for all the kids." She further stated Husband commented that "they were building a family together . . . there was a lot of work done on all the kids' rooms to make them feel like a home for all three boys."

Even though the title to the home remained in Husband's name, his actions in concert with Wife established that more likely than not, the property became marital. Separate property can become marital property even without a change in the title. As this court said in *Mondelli v. Howard*, 780 S.W.2d 759, 774 (Tenn. Ct. App. 1989), "[i]n the final analysis, the status of property depends not on the state of its record title, but on the conduct of the parties." Although Husband may consider Wife's contributions to be minor, the evidence in the record is sufficient to support the trial court's finding of transmutation of the Royal Mountain house. Accordingly, we conclude that the trial court did not err in classifying the home as marital property.

**b.**

In all divorce cases, after classifying the parties' property, the trial court is directed to "equitably divide, distribute or assign the marital property between the parties without regard to marital fault in proportions as the court deems just." Tenn. Code Ann. § 36-4-121(a)(1); *Davidson v Davidson*, No. M2003-01839-COA-R3-CV, 2005 WL 2860270, at *2 (Tenn. Ct. App. Oct. 31, 2005); *Edmisten v. Edmisten*, No. M2001-00081-COA-R3-CV, 2003 WL 21077990, at *11 (Tenn. Ct. App. May 13, 2003). Decisions regarding the value of marital property are questions of fact. *Kinard v. Kinard*, 986 S.W.2d at 231. Accordingly, they are entitled to great weight on appeal and will not be second-guessed unless they are not supported by a preponderance of the evidence. *Smith*, 93 S.W.3d at 875; *Ray v. Ray*, 916 S.W.2d 469, 470 (Tenn. Ct. App. 1995). In making an equitable division of marital property, the trial court is guided by the following relevant factors:

> (1) The duration of the marriage;
>
> (2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

- 10 -

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c). The factors are not listed in order of importance, and each is to be considered in relation to the specific facts of each case. See *Powell v. Powell*, 124 S.W.3d 100, 108 n. 8 (Tenn. Ct. App. 2003).

The court found the factors weighing in Wife's favor and against Husband were as follows:

Her physical and mental injuries caused by Husband's abuse, her lack of employability, her inferior earning capacity to Husband, her lack of separate property except her furnishings and vehicle (Husband still retained his premarital assets), her financial liabilities caused by this case, and her financial

- 11 -

needs. (factor (2))

Her inferior ability as compared to Husband for future acquisitions of capital assets and income. (factor (4)

Her contribution to the acquisition, preservation, and appreciation of the marital assets, including her contribution to the marriage as a homemaker and former wage earner. (factor (5))

She had no pre-marital property except for her furnishings and vehicle. Husband, however, has a pre-marital value in his 401K of $104,603.00 and a pre-marital value of $1,227.00 per month in his pension when he starts to draw. (factor (6))

She had no separate property at the time of the marriage except for her furnishings and her vehicle. Husband owned a house at 2821 Deerfield Drive in Ooltewah, his vehicle, a 401K, and a pension. (factor (7))

She will still be in poor economic circumstances at the time of the division because of factor (2). (factor (8))

She cannot readily access cash from her marital portion of the 401K without facing a 40% penalty and tax. (factor (9))

Wife came into this marriage without physical and emotional injuries to include PTSD and a resulting speech impairment. Wife came into this marriage with a place to live and the means to pay for it. To put her back in the same position she was in when she came into the marriage, required the division that the trial court made. "Once the Wife receives her [ ] share from the sale of the home, Husband's alimony obligation will end." (factor 11))

At the time of the marriage, the equity in the home was $145,000, which was the sale price of $445,000 minus the principal amount of the new loan, $300,000. At the time of the divorce, the equity in the home was determined to be $194,794. Husband claims that the rise in overall equity during the marriage, approximately $50,000, is marital.

We find that Husband should be awarded as his separate property the amount of his down payment on the Royal Mountain residence, $146,586.58. Upon the sale of the

- 12 -

house, Wife is awarded one half of the remaining equity in the marital home after that payment, in addition to the award of one half of the marital interest in Husband's retirement (as found by the trial court).

## c. & d.

Husband argues that the evidence does not support the trial court's findings that he hit Wife, that she was more credible, and that she was the prevailing party. The court, weighing the credibility of the parties, found that Wife was the more credible witness because Husband denied hitting her. The trial court indicated as follows:

> As noted previously, the Wife accuses the Husband of physical abuse [in her texts]. He never denies it. Instead he responds, "I am so incredibly ashamed of myself" "I'm not a monster, Kristen." "I am not a bad person." Apologies so profound and expressions of such regret do not usually come from someone guilty of momentary inattention. The Wife's testimony on this issue is more credible. The Wife has proven inappropriate marital conduct by the Husband and the divorce will be granted to her on those grounds.

In an order regarding discretionary costs, the court ruled:

> The [Husband] was not the prevailing party. The [Wife] was awarded the divorce based on [Husband's] inappropriate marital conduct. She was awarded alimony. Court costs were assessed against the [Husband]. The expert witnesses were hired in regard to the [Husband's] allegation that certain photographs produced by the [Wife] were altered or staged. He did not prevail on that issue. . . .

Because trial courts are in a far better position than this court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991). Consequently, where issues of credibility and weight of testimony are involved, we will accord considerable deference to the trial court's factual findings. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)). We will not re-evaluate a trial court's credibility determinations "'absent clear and convincing evidence to the contrary.'" *Davis v. Davis*, 223 S.W.3d 233, 238 (Tenn. Ct. App. 2006) (citing *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)). We find that a preponderance of the evidence supports the determination of the trial court. There was

no clear and convincing evidence to the contrary. We are, therefore, disinclined to disturb the trial court's decision.

As for the battle of the experts regarding the photographs and make up, the trial court found the evidence to be conflicting and confusing. Husband claimed that the images of Wife's injuries as depicted in photographs she took with her phone were faked, and that Wife had used make-up to make her skin appear bruised. Husband asserted further that the metadata[5] connected to the images revealed that the photographs were created after Wife had obtained a protective order against him. Husband's expert, Jim Wells, testified that the metadata indicated that all the pictures were taken during February and March 2016, long after the order of protection. He asserted that the camera used to take the pictures had an IOS ("Internal Operating System") that was not released to the public until after the order of protection. Wife claimed that the abuse pictures were taken before the protective order hearing, but that except for the one picture of the swollen left eye, the other photos had disappeared from her phone by the time of the hearing. According to Wife, Husband, an IT expert at Unum, lifted the photographs from their shared iCloud account and manipulated the metadata to make it look as if the photographs were created after the protective order was entered. She surmised that Husband missed the one image relating to the eye because he only conducted a search for pictures showing bruises. Husband claimed that he did not have access to Wife's iCloud and did not manipulate the metadata. Wife's expert, Steve Linn, concluded that the metadata of the photos had been manipulated. He also determined that a spying application had been present on Wife's laptop. Wife's photograph expert, Joshua Berman, testified that the photographs had not been photo shopped and the images themselves had not been manipulated.

Husband's expert, Dr. Martha Burt, opined that the images in the photographs did not match up with how typical bruising appears. She related that the coloration and shapes, as well as other indicators, left her with no doubt that the pictures were not of injuries. As to the pictures depicting a swollen eye, Dr. Burt testified that they do not, in her opinion, depict trauma, due to an absence of any discoloration or bruising. Husband's make-up expert, Joseph Mistretta, observed that the photographs revealed particles of residue where Wife had scraped the make-up off. He claimed that the discoloration in the images was makeup and that it was used in every picture.

Wife's make-up expert, Susan Maccoy, opined that the photos revealed no evidence of make-up in the pores on Wife's skin. She described broken capillaries that, in her opinion, could not be manufactured because of their tiny size. She also claimed that it would be physically impossible for Wife to put make-up on herself in order to make the bruises at issue. Amanda Thompson, a nurse practitioner with the Skin Cancer

---

[5]"Metadata" is defined as data contained in a file about the file, such as when the photo was taken, what kind of camera was used, or even the GPS coordinates of where it was taken.

and Cosmetic Dermatology Center, noted that Wife's skin reacts to Bacitracin and manifests what is called post-inflammatory hyperpigmentation. Further, Dr. James Richmond, an ophthalmologist, related that Wife's swollen eye was not caused by Bell's Palsy or an eye infection. He found it within a reasonable degree of medical certainty that trauma might have caused the eye to swell in the way that it did.

The trial court noted: "It is difficult, at best, to determine whether all or some of the bruises were real or manufactured (in the photographs)." The court chose to rely on the text messages between the parties to establish the abuse and inappropriate marital conduct. Additionally, Wife produced evidence through her testimony and medical records that more likely than not she was a battered spouse and received medical treatment for injuries she sustained. We find that the court had sufficient evidence to conclude that Wife was being abused, and that she had carried her burden of proof that by a preponderance of the evidence the fault for the demise of this marriage lies at the feet of Husband. The court appropriately determined whether there was other evidence upon which he could rely that was credible. Because the trial court chose to go with the other credible evidence as opposed to relying on the expert evidence that was contradicted and conflicting, the court did not commit error. Husband "did not prevail" on "the allegations that the photographs . . . were staged or altered." As such, there was no clear and convincing evidence to contradict that Husband hit Wife, was not as credible as Wife because he denied doing it, and that Wife was the prevailing party. The court correctly awarded Wife the divorce pursuant to Tennessee Code Annotated section 36-4-101(11), finding that she was the prevailing party.

**e.**

The trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, the amount, and duration of the award. *See, e.g., Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004); *Burlew*, 40 S.W.3d at 470.

The court concluded that Wife needed transitional alimony and that Husband had the ability to pay. Therefore, the court fashioned transitional alimony in such a way that Wife was allowed to stay in the residence while Husband continued to pay for the mortgage and the utilities until the house could be sold and Wife received her interest in it. Transitional alimony is defined as "a sum of money payable by one (1) party to, or on behalf of, the other party for a determinate period of time. Transitional alimony is awarded when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce. Tenn. Code Ann. § 36-5-121. It is designed to aid a spouse who needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income. Transitional alimony is payable for a definite period of time and may be modified only upon certain

circumstances: (1) the parties agree that it may be modified; (2) the court provides for modification in the divorce decree; or (3) the recipient spouse resides with a third person following the divorce. Tenn. Code Ann. § 36-5-121(g)(2).

Husband asserts that he has paid this alimony for longer than the parties resided together. He argues that Wife has had adequate time to adjust and that alimony should cease.

We can find an abuse of discretion only if the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party. *Burton v. Mooneyham*, No. M2011-00909-COA-R3-CV, 2012 WL 1070121, at *8 (Tenn. Ct. App. Mar. 29, 2012). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives, and thus envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal." *Gonsewski*, 350 S.W.3d at 105-06. Accordingly, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court will presume that the decision is correct and will review the evidence in the light most favorable to the decision. *Id.*

In determining whether to award support, Tennessee Code Annotated section 36-5-121 provides for the weighing of certain factors:

> (1)   The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
>
> (2)   The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
>
> (3)   The duration of the marriage;
>
> (4)   The age and mental condition of each party;
>
> (5)   The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be the custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i). Although each of these factors must be considered when relevant to the parties' circumstances, "the two that are considered the most important are the disadvantaged spouse's need and obligor spouse's ability to pay." *Mayfield v. Mayfield*, 395 S.W.3d 108, 116 (Tenn. 2012).

The trial court made the following findings:

Wife's inferior earning capacity as compared to Husband's, Wife's obligations and needs, particularly due to the divorce, Wife's lack of financial resources except her child support for her son from a prior marriage. (factor (1))

Wife's impaired ability to communicate, caused by Husband's abuse. (factor (4))

Wife's physical and emotional injuries, caused by Husband's

- 17 -

abuse.  (factor (5))

Wife's separate assets consist of her furnishings and car. Husband has a car and a 401K with a pre-marital value of $104,603.00 and a pension with a pre-marital value of $1,227.00 per month when he starts to draw.  (factor (7))

The parties have had a comfortable economic standard of living during the marriage.  (factor (9))

Wife has made contributions to the marriage by putting her monies into the joint bank account, by transferring her pre-marital alarm system (hardware and service) to the marital home, and by doing the majority of the lawn upkeep, house cleaning, upkeep of the house, and cooking.  (factor (10))

Husband is the cause for the demise of this marriage.  (factor (11))

Wife is unable to work at this time due to her PTSD, stutter, and inability to communicate her thoughts.  Husband's abuse more likely than not caused Wife's condition.  Moreover, Wife's alimony will be taxable to her and deductible by Husband.  (factor (12))

The court found that given Husband's superior earning capacity, until Wife can receive her interest in the marital assets, she should remain in the marital residence and Husband should continue to make the mortgage and utility payments on the home as transitional alimony.  The trial court determined that once Wife received money from her interest in the marital residence, the alimony would end.

In our view, the court was not in error in awarding transitional alimony based on a preponderance of the evidence presented.  Wife's Income and Expense Statement and her testimony regarding same supports this award.  The record before us demonstrates fault on the part of Husband and need on the part of Wife. *See Fisher v. Fisher*, 648 S.W.2d 244 (Tenn. 1983).  The preponderance of the evidence supports a determination that Husband had the ability to pay this support.

**f.**

The trial court held that "[e]ach party is to pay their own attorney fees."  Wife posits that the trial court erred by failing to award her attorney's fees as alimony in

solido.

When determining whether to award attorney's fees as alimony in solido, the trial court should consider the evidence in relation to the statutory factors set forth in Tennessee Code Annotated section 36-5-121(i). The general rule is that a "spouse with adequate property and income is not entitled to an award of alimony to pay attorney's fees and expenses." *Umstot v. Umstot*, 968 S.W.2d 819, 824 (Tenn. Ct. App. 1997). "Such awards are appropriate only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses, or the spouse would be required to deplete his or her resources in order to pay them. *Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992); *Harwell v. Harwell*, 612 S.W.2d 182, 185 (Tenn. Ct. App. 1980). The facts of this case support an award of attorney's fees and litigation expenses as alimony in solido, as Wife currently has little income and lacks the funds to pay these fees. She is clearly economically disadvantage compared to Husband. Given the fact that Husband was found to be at fault in causing the demise of the marriage, was not credible, and given his superior earning capacity and separate property, the court erred in ordering each party to pay their own attorney's fees, as Wife will otherwise be required to deplete any assets that she was awarded to pay same.

Wife is entitled to an award of attorney's fees as alimony in solido. We therefore remand this issue to the trial court for the determination of a reasonable amount of attorney's fees to be awarded to Wife at the trial court level.

**g.**

For the same reasons that Wife seeks attorney's fees at the trial level, she also seeks attorney's fees incurred at the appellate level. Wife does not work, cannot work at this time due to her health, and will have to encroach upon her award of equity in the house to pay for same, while meanwhile facing the end of transitional alimony upon the sale of the house, signaling the beginning of her reliance on those proceeds to support herself.

As we have stated:

> [I]t is in the sole discretion of this court whether to award attorney's fees on appeal. As such, when this court considers whether to award attorney's fees on appeal, we must be mindful of "the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered."

- 19 -

*Parris v. Parris*, No. M2006-02068-COA-R3-CV, 2007 WL 2713723, at *13 (Tenn. Ct. App. Sept. 18, 2007) (quoting *Dulin v. Dulin*, No. W2001-02969-COA-R3-CV, 2003 WL 22071454 (Tenn. Ct. App. Sept. 3, 2003)) (other internal citations omitted). Taking these factors into account, we award Wife her attorney's fees on appeal.

## V. CONCLUSION

The trial court's findings are affirmed in part as modified and reversed in part. We award Husband the amount of his down payment on the marital home. The trial court's judgment denying an award of Wife's attorney's fees is reversed, as we determine that Wife is entitled to an award of attorney's fees incurred at the trial level as alimony in solido. We remand the issue of the amount of reasonable attorney's fees to be awarded to Wife to the trial court for an appropriate award. Wife is also awarded her attorney's fees and costs incurred on appeal. This case is remanded for any further proceedings as may be necessary and are consistent with this opinion. The costs of this appeal shall be taxed to the appellant, Jason Vincent Carden.

_____
JOHN W. MCCLARTY, JUDGE